# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN J. GORRA, | Civil No. 12-410 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

Matthew A. Drewes and James H. Gempeler, **THOMSEN & NYBECK, P.A.**, 3600 American Boulevard West, Suite 400, Bloomington, MN 55431, for plaintiff.

Charles F. Webber and Elizabeth Ann Walker, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendant.

This case arises out of defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") denial of plaintiff John Gorra's application for a loan intended to finance renovation of Gorra's rental property. Gorra brings claims for negligence, negligent misrepresentation, and violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq.*, due to Wells Fargo's delay in notifying Gorra that he would not receive the requested loan. The case is now before the Court on Wells Fargo's motion for summary judgment. Because a material issue of fact remains regarding the proximate cause of Gorra's damages, the Court will deny Wells Fargo's motion with respect to the negligence and ECOA claims. The Court will grant Wells Fargo's motion for summary judgment on the

negligent misrepresentation claim because Gorra's reliance on the alleged misrepresentations was unjustifiable as a matter of law.

## BACKGROUND

### I. THE LOAN APPLICATION

Gorra owned a rental duplex (the "Property") in Minneapolis, Minnesota. (Ex. ("Wells Fargo App.") at 2-45 (Dep. of John Gorra ("Gorra Dep. A") 12:8-15), Apr. 1, 2013, Docket No. 30; Aff. of John J. Gorra ¶ 4, Apr. 22, 2013, Docket No. 37.)[1] In September 2009, Gorra applied for a loan from Wells Fargo to finance improvements on the Property. (Wells Fargo App. at 49; Gorra Aff. ¶ 13.) Gorra intended to remodel the Property into two single family homes attached by a common wall and then sell the Property as separate units. (Gorra Aff. ¶ 8; Second Aff. of Matthew A. Drewes, Ex. A ("Gorra Dep. B") 46:15-47:1, Ex. 2, Apr. 22, 2013, Docket No. 36.) At the time Gorra sought a loan, Wells Fargo already held a first mortgage on the Property in the amount of approximately $200,000. (Gorra Dep. B 48:24-25, Ex. 2.) Gorra also had a checking

---

[1] Instead of filing affidavits and attaching relevant documents as exhibits, Wells Fargo filed a single exhibit, entitled Wells Fargo Appendix containing all of the documents in support of its motion in consecutively paginated form. The Order refers to this document as "Wells Fargo App." In its responsive memorandum, Gorra argued that because Wells Fargo failed to attest to the authenticity of the exhibits produced, the Court should not consider these documents in deciding Wells Fargo's motion for summary judgment. When Wells Fargo filed its reply brief it included declarations and affidavits providing foundation for the documents submitted as part of the appendix. (*See* Decl. of Elizabeth A. Walker, May 6, 2013, Docket No. 39; Decl. of Charles F. Webber, May 6, 2013, Docket No. 40; Aff. of Dale Streiff, May 6, 2013, Docket No. 41.) Gorra indicated at oral argument that this production satisfied its request for foundation and indicated that he no longer objects to the Court's consideration of the documents produced in the Wells Fargo Appendix.

account, a credit card, and an unsecured line of credit through Wells Fargo, and owed between $10,000 and $15,000 on both the credit card and line of credit. (*Id.* 47:10-48:1.)

To initiate the loan application process, Gorra sent a letter to his personal banker, Jean Willier, expressing his desire to obtain financing for improvements on the Property. (*Id.* 49:19-23.) Gorra sought a home equity loan of approximately $60,000, secured by the Property, and provided Willier with his proposed business development plan detailing the costs and projected returns of the improvements to the Property. (Wells Fargo App. at 48; Gorra Dep. B, Ex. 2.) Gorra's business plan indicated that he currently received $1,100 in rent each month for each unit in the duplex, and that the market value of the Property in its current state was between $260,000 and $295,000. (Gorra Dep. B, Ex. 2.) Gorra projected that after improvements, each unit on the Property would be worth between $190,000 and $225,000. (*Id.*)

After receiving Gorra's business development plan, Willier referred him to Dale Streiff, a Wells Fargo home renovation loan specialist. (Gorra Dep. B 53:21-54:3.) On September 24, 2009, Gorra submitted an application for a home renovation loan (the "Loan Application"). (Wells Fargo App. at 49; Gorra Aff. ¶ 13.) The next day Streiff e-mailed Gorra to confirm receipt of the Loan Application. (Wells Fargo App. at 49.)

## II. INITIAL LOAN PROCESSING

On October 4, 2009, Streiff told Gorra that he could not be approved for the loan because his credit score was below 680. (Gorra Aff. ¶ 18.) To ensure that his credit score did not hamper his ability to qualify for the loan, Gorra began making efforts to

clear any accounts reflecting negatively upon his score. (*Id.* ¶ 20.) In particular, Gorra contacted Macy's with regard to a credit card delinquency that appeared on his credit report. (*Id.*, Ex. B.) In response, Macy's removed the derogatory information from Gorra's credit history and reported his account as current. (*Id.*; Gorra Dep. B 60:10-61:13.) Gorra also had a tax lien related to overdue property taxes on the Property removed from his report. (Gorra Dep. B at 61:24-62:15.) Streiff and Gorra spoke again about his credit score sometime in October, and Gorra sent Streiff another e-mail on October 23, 2009, showing Gorra's credit score from three major credit bureaus as 712 or 724. (Gorra Dep. B, Ex. 4.)

On November 3, 2009, Streiff e-mailed Gorra and indicated that Gorra's credit report now reflected a score of 683. (Gorra Dep. B 80:19-81:3; Wells Fargo App. at 53.) Streiff's e-mail then stated: "So far so good." (Wells Fargo App. at 53.) The e-mail also requested that Gorra provide a list of properties associated with the loans on his credit report, indicate whether taxes and insurance were part of the payments on those loans, indicate the value of those properties, and send Streiff copies of Gorra's 2008 tax returns. (*Id.*) Gorra responded to Streiff by e-mail that same day, indicating that he would ask Willier to forward Gorra's tax documents to Streiff. (*Id.*) Gorra also provided the other information requested in Streiff's e-mail. (Gorra Dep. B 89:8-11.)

On November 9, 2009, Gorra sent Streiff an e-mail which stated "what is our status?" (Wells Fargo App. at 55.) The next day, Streiff responded and restated his requests for the information identified in the November 3 e-mail. (*Id.* at 56.) Gorra contends that on November 10 he had already provided Streiff with the requested

information, but provided it to Streiff again. (Gorra Dep. B 89:8-17, 93:1-14.) Streiff's e-mail also asked Gorra whether he had any bids from contractors for the planned renovation work. (Wells Fargo App. at 56.) Gorra testified that he could not recall whether he answered this inquiry. (Gorra Dep. B 90:17-91:6.) Gorra testified both that he provided that information in his original Loan Application, and also that information about bids was not a requirement of the Loan Application. (*Id.* 89:18-90:2, 91:15-17.)

## III. FEDERALLY REQUIRED DISCLOSURES

On November 13, 2009, Streiff sent Gorra federally required disclosures related to the Loan Application. (Wells Fargo App. at 58-71.) The documents included the Truth-in-Lending Disclosure, Good Faith Estimate of Settlement Costs, and a Truth-in-Lending Addendum. (*Id.*) The packet containing these disclosures thanked Gorra for allowing Streiff to assist Gorra "in the initial steps of your Wells Fargo Bank, N.A. loan application," and stated that "[a]s you continue through the loan process, I'll do everything I can to ensure that the program you select is the best fit for your financial needs and goals." (*Id.* at 58.) Gorra's loan profile listed an "[a]nticipated closing date" of December 15, 2009. (*Id.* at 59.) The Truth-in-Lending Act Addendum indicated that the total loan amount would be $290,053. (*Id.* at 64.) Gorra testified that he never asked for a loan in this amount, but that Wells Fargo had suggested this larger amount, with which Gorra would pay off his existing mortgage and also obtain financing for the renovations. (Gorra Dep. B 185:4-21.)

On November 15, 2009, Gorra failed to make a payment due on his existing loan from Wells Fargo secured by a mortgage on the Property. (*Id.* 111-13, 170:11-18; Gorra Aff. ¶ 16.) Gorra was unable to make the payments because his tenants had not paid rent and because Gorra had already begun to incur expenses for renovation. (Gorra Dep. B 124:1-5; Gorra Aff. ¶ 16.) Gorra believed that the renovation loan would be used to satisfy his existing loan, and eliminate that mortgage. (Gorra Dep. B 108:1-13, 113:10-19.) Because he believed the closing on the renovation loan would happen on December 15, 2009, Gorra did not make his November payment to bring his account current, and assumed that Wells Fargo would have no opportunity to report his existing line of credit as thirty days late. (*Id.* 108:1-23; Gorra Aff. ¶¶ 23, 25.)

### IV. DENIAL OF LOAN APPLICATION

On December 14, Gorra sent Streiff an e-mail asking where and when the December 15 closing would occur. (Wells Fargo App. 74.)

On December 15, Wells Fargo called Gorra, inquiring as to the status of Gorra's overdue November 15 payment on the existing Wells Fargo loan. (Gorra Aff. ¶ 26.) During this phone call, Gorra discussed with the Wells Fargo representative the plan to retire the existing loan during the closing of the renovation loan scheduled for that day. (*Id.* ¶ 27; Gorra Dep. B 142:6-21.) Streiff was conferenced in on the call, and explained to Gorra for the first time that the renovation loan would not close that day. (Gorra Aff. ¶ 28.) Streiff explained that Gorra's loan had not been approved because his credit report still reflected the tax lien. (Wells Fargo App. at 75-76.) Streiff also sent Gorra an e-mail

indicating that the renovation loan had not been approved by Wells Fargo's system. (Gorra Aff., Ex. C.)

Wells Fargo continued to work on addressing issues in the Loan Application, and resubmitted a revised application. (Gorra Dep. B at 119:23-121:15, 122:1-7.) However, during this period of time Gorra's credit score fell to 514 – reflecting two thirty-day late notices on Wells Fargo accounts from September and December, an overdue Macy's account, and an overdue Bank of America account. (Wells Fargo App. at 79-80.)

In a letter dated January 27, 2010, Wells Fargo notified Gorra that it was denying his Loan Application. (Wells Fargo App. at 81-83.) Wells Fargo cited its reasons for denial as "[i]ncome insufficient for amount of requested credit," "[e]xcessive obligations in relation to income," and "[d]elinquent past or present obligations with others." (*Id.* at 83.) Gorra testified that the letter was postmarked on February 7, 2010. (Gorra Dep. B 170:5-7.)

In February 2010, when the Loan Application was denied, Gorra had been in default for several months on his payments on the existing Wells Fargo loan secured by a mortgage on the Property. (Gorra Aff. ¶ 33.) Due to this default, Wells Fargo initiated foreclosure proceedings in September 2011, and it acquired the Property for just over $100,000. (*Id.* ¶ 35.) During the six-month redemption period provided by Minn. Stat. § 580.23, Gorra sold the Property for $184,000. (*Id.* ¶ 36; Gorra Dep. B 115:10-16.)

## V. GORRA'S DAMAGES

Gorra testified about a variety of damages that he alleges were caused by Wells Fargo's failure to notify him that the Loan Application would ultimately be denied. First, Gorra claims that he incurred various renovation expenses in reliance on receiving the loan. (*Id.* 158-59; Wells Fargo App. at 89.) Gorra testified that in October or November of 2009 he incurred costs to obtain separate titles for the two homes he intended to create. (Gorra Dep. A 158:12-18.) Gorra also incurred expenses related to water heaters, furnaces, appliances, landscaping, and painting between September and December 2009. (*Id.* 26-28, 159:3-25; Gorra Dep. B 180:21-25.) Second, Gorra claims damages in the form of lost rent. (Wells Fargo App. at 89.) Gorra testified that his tenants stopped paying rent in the fall of 2009 because they believed the Property was being renovated for sale, which would force the tenants to move. (Gorra Dep. A 24:9-13, 32:1-4.)

Gorra also testified as to damages he suffered with respect to his existing Wells Fargo loan, due to Wells Fargo's failure to alert Gorra earlier than December 15, 2009, that it would not close on his loan. Gorra testified that if Wells Fargo had alerted him earlier that the loan would not close he would have had time to raise the funds necessary to make the November payment on his existing Wells Fargo loan, avoided a thirty-day late notice on his credit report, and avoided the continuing decline of his credit score. (Gorra Dep. B 154:1-156:12.) Gorra admitted in his deposition that the actions he could have taken were "kind of conjecture," but testified that "I . . . could have worked out some loan modification where [Wells Fargo] extended out payments or I could have sold something or I could have pressured the tenants harder. There were things that may have

been able to have been accomplished had I known something prior to the actual December 15th." (Decl. of Elizabeth A. Walker, Ex. B ("Gorra Dep. C") 191:25, May 6, 2013, Docket No. 39.) In particular, Gorra testified that he had assets such as a coin collection, "two or three extra cars," guns, and a boat that he could have sold in early December to raise the necessary funds. (*Id.* 192:8-15.)

Gorra also alleges that the delay prevented him from seeking other financing options for the renovation prior to the damage to his credit caused by Gorra's inability to satisfy his existing Wells Fargo payments with the proceeds of the renovation loan. (Gorra Aff. ¶ 31.) Gorra claims that he was damaged because his application for a Chase credit card was denied after the events involving Wells Fargo. (Gorra Dep. A 163:1-3.) Gorra testified that he did not know exactly why Chase denied his credit card application. (*Id.* 163:18-20.) Gorra further testified that he informally inquired about financing at U.S. Bank sometime after Wells Fargo denied his Loan Application, and after looking at his credit U.S. Bank told him he could not obtain a loan. (Gorra Dep. C. 190:24-191:6.) Finally, Gorra claims that if he had not received a thirty-day-late mark on his credit the Property would not have become a distressed asset and, even without the renovations, he would have been able to sell the Property at market value for between $260,000 and $360,000 – instead of for $184,000 as a distressed asset. (Gorra Aff. ¶¶ 24, 32, 34; Gorra Dep. B 156:4-8.)

Gorra brought the present action against Wells Fargo in Hennepin County District Court and Wells Fargo removed the action to this Court. (Notice of Removal, Ex. A ("Compl."), Feb. 16, 2012, Docket No. 1.)

**ANALYSIS**

I. **STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II. **NEGLIGENCE**

To succeed on a negligence claim under Minnesota law, Gorra must prove (1) that Wells Fargo had a legal duty of care; (2) that Wells Fargo breached that duty; (3) that the breach of that duty was the proximate cause of Gorra's harm; and (4) damage. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820-21 (8th Cir. 2010); *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). Gorra's negligence claim, as articulated in his complaint and refined in his brief opposing the instant motion, alleges that Wells Fargo had a duty to inform him in a timely manner that the Loan Application would be denied. (Compl. ¶ 35.)

Wells Fargo asks the Court to assume, for purposes of this motion, that Wells Fargo had a duty to inform Gorra at some point before December 15 that it would not be closing on his loan that day, and that it breached that duty. Therefore, Wells Fargo argues only that Gorra has failed to raise a genuine issue of material fact with respect to causation and damages.

"There is proximate cause between a negligent act and an injury when the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others." *Lietz v. N. States Power Co.*, 718 N.W.2d 865, 872 (Minn. 2006) (internal quotation marks omitted). Additionally, the defendant's conduct is only the proximate cause of the harm "if the act was a substantial factor in the harm's occurrence." *George v. Estate of Baker*, 724 N.W.2d 1, 10 (Minn. 2006). "The existence of proximate cause is usually a question of fact for the jury." *Lietz*, 718 N.W.2d at 872. The Court decides proximate cause as a matter of law only where reasonable minds could not disagree on the issue. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 115 (Minn. 1992).

As an initial matter, the Court notes that in order for Wells Fargo's breach to have been the proximate cause of Gorra's damages, the damages must have been sustained after Wells Fargo's hypothetical breach. Therefore any damages suffered or expenses incurred by Gorra prior to Wells Fargo's alleged breach will not be recoverable at trial. In the absence of argument on the nature and extent of Wells Fargo's alleged duty the Court is unable, at this stage, to ascertain which, if any, of Gorra's damages, were incurred prior to Wells Fargo's hypothetical breach.

Assuming as it must, for purposes of this motion, that Wells Fargo breached a duty to notify Gorra prior to December 15 that his loan would not be approved; the Court finds that Gorra has presented sufficient evidence of damages proximately caused by such a breach to survive a motion for summary judgment. If Wells Fargo in fact breached a duty by failing to inform Gorra that he would not receive the loan prior to Gorra incurring renovation expenses and losing rents as a result of those renovations, a reasonable jury could find that Wells Fargo's breach was a substantial factor in causing Gorra's damages. A reasonable jury could also find that had Gorra received advanced notice that his loan would not close on December 15, he would have made other efforts to obtain the funds necessary to make the outstanding November 15 payment on his existing Wells Fargo loan. Gorra testified that he had unencumbered assets, including a coin collection, several cars, guns, and a boat, that he could have attempted to sell. Gorra also testified that he could have attempted to work out a different payment arrangement with Wells Fargo on his original loan, had he been given time to negotiate such an arrangement. Finally, Gorra testified that if he had been given even several extra days' notice, he could have made additional attempts to collect rent from his tenants. A reasonable jury could further conclude that Wells Fargo's breach, if such a breach in fact occurred, proximately caused Gorra's inability to make other arrangements to pay his existing outstanding Wells Fargo loan balance, which caused damage to Gorra's credit and contributed to Gorra's inability to sell the Property, as a distressed asset, at fair market value. Therefore Wells Fargo's alleged breach could have substantially contributed to Gorra's lost profit damages. Whether or not Gorra's attempts to raise the funds necessary to make the

payment or obtain other financing would have been successful had Wells Fargo provided him with notice that his loan would not close are questions for the jury. Although Gorra did not present expert testimony that he would have been able to sell his assets or acquire other financing, the Court finds that Gorra's testimony provides sufficient evidence upon which a reasonable jury could conclude that some of his efforts may have been successful.

The extent of Gorra's damages that were proximately caused by Wells Fargo's alleged breach is also a question for the jury. It is certainly possible that based upon the evidence in the record, a reasonable jury could conclude that Gorra would have been unable to raise the necessary funds or obtain other financing. A jury could also determine that Wells Fargo's hypothetical breach was a substantial factor in bringing about only a portion of Gorra's claimed damages. "The question before the Court, however, is whether this is a case in which reasonable minds could only reach the conclusion that [Wells Fargo]'s actions did not proximately cause [Gorra's] injuries." *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 306 (D. Minn. 2011). Here, viewing the evidence in the light most favorable to Gorra, the Court finds that reasonable minds could differ on the question of proximate causation. Therefore, the Court will deny Wells Fargo's motion for summary judgment on Gorra's negligence claim.[2]

---

[2] The Court notes that in addition to proving proximate cause and damages at trial, Gorra will also be required to establish the elements of duty and breach, which Wells Fargo did not contest for purposes of this motion.

## III. NEGLIGENT MISREPRESENTATION

To prevail on a claim for negligent misrepresentation under Minnesota law, Gorra must prove that (1) Wells Fargo owed Gorra a duty of care; (2) Wells Fargo, by its failure to use reasonable care, made a false representation or failed to discover or communicate certain information that an ordinary person in its position would have discovered or communicated; (3) the misrepresentation occurred in the course of Wells Fargo's business or in a transaction in which it had a pecuniary interest; (4) Gorra relied on the information; (5) Gorra was justified in relying on the information; and (6) Gorra was financially harmed by his reliance. *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 985 (8th Cir. 2008); *Hardin Cnty. Sav. Bank v. Hous. & Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012); *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012); *Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986).

Gorra contends that his negligent misrepresentation claim is based upon Wells Fargo's failure to communicate regarding the status of Gorra's loan between November 13 (the day Wells Fargo sent Gorra the federally required disclosures) and December 15. In particular, Gorra argues that he justifiably relied on this silence to mean that the loan transaction would close on December 15 in light of the fact that (1) he had promptly responded to Wells Fargo's inquiries regarding his Loan Application and provided Wells Fargo with up to date information about his credit report; (2) he received an e-mail from Streiff indicating "so far so good"; and (3) the federally required disclosures indicated an anticipated closing date of December 15 and "spelled out how the transaction was going to look when it was completed." (Pl.'s Mem. in Opp'n to Mot.

for Summ. J. at 23-24, Apr. 22, 2013, Docket No. 35.) In reliance on his belief that the loan would close, Gorra incurred renovation costs and failed to make payments on his existing Wells Fargo mortgage.

Gorra concedes that his negligent misrepresentation claim cannot be based upon any affirmative representation made by Wells Fargo, because at most Wells Fargo's various communications merely predicted the future status of Gorra's loan and predictions about future events are not actionable in Minnesota as negligent misrepresentations. *See Trooien v. Mansour*, 608 F.3d 1020, 1028-29 (8th Cir. 2010). Instead, Gorra argues that Wells Fargo's silence, after making the representations described above, led him to reasonably believe that he would close on his loan on December 15. The Court finds, as a matter of law, that Gorra's reliance on Wells Fargo's silence to assume that the Loan Application would be approved and would close on December 15 was not justified.

Gorra has identified no representation by Wells Fargo that the Loan Application had been approved or that it necessarily would be if he promptly responded to Wells Fargo's inquiries. Gorra had an ongoing relationship with Wells Fargo and had received loans in the past. The Court finds that he should have known that neither his prompt responses to Wells Fargo, the preliminary disclosures, nor Streiff's e-mail indicated that his loan had been or would be approved. Wells Fargo's communications, while perhaps indicating that it was **likely** that the loan transaction would close on December 15, were clearly not guarantees. "So far so good" unequivocally suggests that more steps remain in the process. And the disclosures referred to the "anticipated" closing date. A

reasonable jury, therefore, could not find that Gorra was justified in assuming that several weeks of silence from Wells Fargo indicated that his loan had been, or necessarily would be, approved.[3]  *See Davis v. U.S. Bancorp*, 383 F.3d 761, 768-69 (8th Cir. 2004) (affirming summary judgment finding that plaintiff was not justified in relying solely upon her own perception that she was approved for a loan after receiving preliminary loan documents, when the bank had never indicated that she was approved); *see also Griffith v. Bank of Am., N.A.*, No. CV 11-5867, 2011 WL 6849048, at *3 (C.D. Cal. Dec. 13, 2011) (explaining that federally required loan disclosures based upon a loan application could not form the basis of a negligent misrepresentation claim).  Because the Court finds that no reasonable jury could conclude that Gorra's reliance on Wells Fargo's silence as an indication that his loan would close was justified, it will grant Wells Fargo's motion for summary judgment with respect to this claim.

## IV.   ECOA CLAIM

### A.   Actual Damages

The ECOA "establishes procedural requirements for extending credit and communicating with applicants."  *Davis*, 383 F.3d at 766.  Of relevance to the present case, the ECOA requires a creditor to notify a credit applicant of its actions on the application "[w]ithin thirty days . . . after receipt of a completed application for credit."

---

[3] Gorra attempts to distinguish reliance on the fact that his loan would close on December 15 with reliance on the belief that Wells Fargo would approve the loan.  The Court finds that is a distinction without a difference.  Gorra's actions taken in reliance on Wells Fargo's alleged misrepresentation – including incurring renovation costs and failing to pay his existing loan – all stemmed from his mistaken certainty in the fact that his application would be approved and he would receive the loan.

15 U.S.C. § 1691(d)(1). The ECOA provides that, "[a]ny creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant." 15 U.S.C. § 1691e(a). "[A]ctual damages may include out-of-pocket monetary losses, injury to credit reputation and mental anguish, humiliation or embarrassment." *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 148 (5th Cir. 1983). To prevail on a claim for actual damages under the ECOA, Gorra must prove that the losses he suffered were caused by Wells Fargo's violation of the statute. *See Coulibaly v. J.P. Morgan Chase Bank, N.A.*, Civ. No. 10-3517, 2012 WL 3985285, at *7 (D. Md. Sept. 7, 2012) (granting summary judgment where "Plaintiffs have failed to meet their burden to prove specifically out-of-pocket losses caused by Chase's failure to respond to the March 2009 Application within 30 days").

Wells Fargo asks the Court to assume, for purposes of this motion, that it violated the ECOA when it failed to timely inform Gorra of Wells Fargo's action on his Loan Application. Relying upon its arguments made with respect to the negligence claim, Wells Fargo contends only that Gorra has not established actual damages resulting from Wells Fargo's purported statutory violation, and therefore cannot recover on his ECOA claim. Because the duty Wells Fargo allegedly breached in connection with Gorra's negligence claim is the same conduct that forms the basis of the hypothetical ECOA violation, the Court finds that, as explained above, a material issue of fact remains with respect to whether Gorra's damages were caused by Wells Fargo's delay in alerting him

that his Loan Application would be denied. The Court will therefore deny Wells Fargo's motion for summary judgment with respect to Gorra's ECOA claim for actual damages.

### B. Punitive Damages

The ECOA also provides that "[a]ny creditor . . . who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages." 15 U.S.C. § 1691e(b). In determining whether punitive damages may be awarded the ECOA directs courts to consider "the amount of any actual damages awarded, the frequency and persistence of failure of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional." *Id.* Courts may award punitive damages if "the creditor wantonly, maliciously or oppressively discriminates against an applicant," or acts "in reckless disregard of the requirements of the law, even though there was no specific intention to discriminate on unlawful grounds." *Anderson v. United Fin. Co.*, 666 F.2d 1274, 1278 (9th Cir. 1982) (internal quotation marks omitted); *see also Fischl*, 708 F.2d at 148.

The Court finds that Gorra has presented no evidence supporting an award of punitive damages. In particular, Gorra has identified only a single instance of an alleged ECOA violation. Further, there is no evidence that would allow a factfinder to conclude that Wells Fargo's conduct was wanton, malicious, or in reckless disregard of the ECOA's requirements. The statutory provision relied upon by Gorra punishes a

creditor's inaction. Although the record reflects a period during which Wells Fargo failed to communicate with Gorra, the record also reflects that Wells Fargo made several inquiries regarding Gorra's Loan Application, worked with Gorra to establish an optimal loan structure, monitored Gorra's fluctuating credit score, and continued to take steps to provide Gorra with a loan even after his initial Loan Application was denied. These actions do not support a finding that Wells Fargo failed to notify Gorra of its actions on his Loan Application in reckless disregard of the ECOA. Accordingly, the Court will grant Wells Fargo's motion for summary judgment with respect to Gorra's request for punitive damages.

### C. Attorney Fees

Finally, Gorra requests attorney fees under the ECOA. The Court finds that any determination of entitlement to attorney fees is premature, as the statute requires a plaintiff to be successful in an ECOA action before fees are recoverable. *See* 15 U.S.C. § 1691e(d).

This case will be placed on the Court's next available trial calendar.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 28] is **GRANTED in part** and **DENIED in part** as follows:

1. The motion is **DENIED** as to Plaintiff's negligence claim (Count I).

2. The motion is **GRANTED** as to Plaintiff's negligent misrepresentation claim (Count II). Plaintiff's negligent misrepresentation claim is **DISMISSED with prejudice**.

3. The motion as to Plaintiff's ECOA claim (Count III) is **DENIED** with respect to Plaintiff's claim for actual damages and **GRANTED** with respect to Plaintiff's claim for punitive damages.

DATED: July 12, 2013  
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____  
JOHN R. TUNHEIM  
United States District Judge